1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  MICHAEL MCPHAIL; ROBERT BARR KIMNACH III; KEVIN and JENNIFER MORRISON; SCOTT and KRYSTIN WAGNER; CANDACE and NEIL HURLEY; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FIRST COMMAND FINANCIAL PLANNING, INC.; FIRST COMMAND FINANCIAL SERVICES, INC.; LAMAR C. SMITH; and HOWARD M. CRUMP,<br><br>Defendants. | CASE NO. 05CV179  IEG (JMA)<br><br>**ORDER (1) GRANTING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, (2) GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION TO STRIKE THE BULLARD REPORT, and (3) DENYING ALL DEFENDANTS' REMAINING MOTIONS TO STRIKE**<br><br>(Doc. Nos. 148, 164) |

Presently before the Court is plaintiffs' motion for class certification.  (Doc. No. 148.) Also presently before the Court are defendants' motions to strike (1) the Bullard Report, (2) references in the consolidated second amended complaint ("CSAC") to a January 2000 letter from the National Association of Securities Dealers ("NASD"), (3) class allegations against First Command Financial Services, Inc. ("the parent corporation") and Smith and Crump (taken together, "individual defendants"), and (4) portions of the proposed class definition.  (Doc. No. 164.)  For the reasons stated below, the Court grants the motion for class certification but modifies

the definition of the class.  The Court grants in part the motion to strike the Bullard Report.  The

Court denies the other motions to strike.

<strong>BACKGROUND</strong>

**A.      Factual History**

First Command Financial Planning, Inc. ("First Command") has over 297,000 customers in

the United States military, including 40% of the current active-duty general officers, one third of

the commissioned officers, and 16% of the non-commissioned officers.  (Pls. Memo. ISO Motion

for Class Certification, at 4; CSAC ¶ 7.) Of the approximately $10.1 billion that First Command

customers invested in mutual funds since 1970, about 70% of that business consisted of the sale of

systematic investment plans ("SIPs") (CSAC ¶ 20.)  First Command sold five different SIPs, and

each plan then made a purchase from one of five different mutual funds.  (Id.)  Prior to the events

giving rise to this litigation, First Command was the "dominant retailer" of SIPs.  (H.R. Rep. No.

109-40, at 5 (2005)).  Of the more than seven trillion dollars invested in the entire mutual fund

market, SIPs accounted for only eleven billion dollars, 90% of which was held by military

personnel.  (Id.)

As explained by the Securities and Exchange Commission ("SEC"), in a First Command

SIP:

> the investor is to pay 180 fixed monthly installments (15 years), which may be
> extended to 300 payments (25 years) at the investor's option with no additional
> sales charge.  First Command customers pay a front-end sales load equal to 50% of
> the first 12 payments, but thereafter pay no additional front-end sales load for the
> life of the plan.

(Pls. Notice of Lodgment ("NOL"), Exhibit 2 ¶ 5.)  For example, if a First Command customer

paid $100 per month for the first twelve investments (total contribution of $1,200), only $600 was

actually invested in the purchase of mutual fund shares.[1]  The other $600 was a sales charge,

92.4% of which was paid to First Command.  (NOL, Exhibit 3, at 6.)  Furthermore, if a First

Command customer later increased the investment amount, the 50% sales charge would apply for

one year to the increased amount.  (NOL, Exhibit 4, at 57, & Exhibit 36, at 180-81.)

---

[1] First Command also offered a no-load fund, the Select Investor Program, for customers
investing a minimum of $250,000.  (NOL, Exhibit 22, at 017274.)

1    After an investor made the first twelve payments, the effective sales load decreased with

2    each payment.  The sales load was 3.3% if the investor made all 180 payments, and eventually

3    decreased to 2% if the investor makes 300 payments.  (NOL, Exhibit 2 ¶ 6.)  If the investor

4    stopped making payments along the way, however, the effective sales load would be higher.

5    Potentially, the load would exceed the 8.5% maximum allowable front-end load commission for

6    conventional load funds[2] and/or the 5.75% industry standard for sales loads. (Bullard Decla.,

7    Exhibit 1 ¶ 10.)

8    To sell SIPs, First Command relied on the "affinity marketing" strategy.  A majority of

9    First Command's sales representatives are former military professionals.  (NOL, Exhibit 19.)

10   Based on the similarity of backgrounds, these representatives engendered the trust of potential

11   First Command customers.  (See, e.g., McPhail Depo., at 40:22–41:1.)  Affinity marketing was

12   particularly effective in the military context because of officers' training to rely on the honesty and

13   integrity of fellow officers.  (Consolidated SAC ¶ 7.)

14   Furthermore, First Command trained its sales force to deliver a "homogenized"

15   presentation that gave prospective SIP customers the "same story," regardless of the agent.  (NOL,

16   Exhibit 26.)  Specifically, First Command directed its sales representatives to memorize the

17   "track," i.e., a script of a conversation with a hypothetical military couple.  (NOL, Exhibit 28, at

18   041967, & Exhibit 30, at 29:14—30:3.)  For example, John Ball, the agent who sold a SIP to

19   plaintiff Michael McPhail, had to memorize "[n]early a hundred percent" of the track before First

20   Command allowed Ball to make sales presentations to potential customers.  (NOL, Exhibit 31, at

21   77:9.)  Because the sales representatives memorized the tracks so well, customers such as plaintiff

22   Robert Kimnach received "the exact same responses" to questions they posed to sales

23   representatives in different cities.  (NOL, Exhibit 33, at 115:11-17.)  According to First

24   Command's then-CEO, however, sales representatives were "[a]bsolutely not" required to adhere

25   verbatim to the track during a sales meeting because "[i]t would be impractical to do so."  (Kelley

26   Decla., Exhibit J, at 413:18-19.)

27   First Command's "track," together with the accompanying charts and graphs, contained

28

_____

[2] See NASD Rule 2830(d).

misleading statements and omissions[3] that triggered SEC cease-and-desist proceedings and a NASD investigation into alleged rule violations.[4]  (NOL, Exhibits 2-3.)  For example, First Command represented the 50% front-end sales load would discipline investors to stay committed to the SIP by making at least 180 payments.  (NOL, Exhibit 2 ¶ 25, & Exhibit 3, at 8-9.)  However, this statement was inaccurate in light of data that only 43% of First Command customers purchasing between 1980 and 1987 actually completed their SIPs by 2004.[5]  (Id.)  Furthermore, among the remaining plans, some plans were "dormant" because customers had not contributed for an entire year.  (Bullard Decla., Exhibit 1 ¶ 20.)  First Command also failed to inform investors about the earnings they lost by paying such high front-end sales loads.  (NOL, Exhibit 2 ¶ 20, & Exhibit 3, at 9.)  Because the sales charges were not invested from the beginning, SIP holders did not make as much money over time.  (Id.)

First Command sales personnel further misrepresented the nature of investment alternatives.  They claimed that no-load mutual funds were popular among speculators and that load funds were typically restricted to large, private accounts.  (NOL, Exhibit 2 ¶¶ 19, 21, & Exhibit 3, at 9-10.)  They claimed that no-load funds had some of the highest-long term costs when, in fact, no-load funds have substantially lower costs.  (NOL, Exhibit 2 ¶ 21, & Exhibit 3, at 10.)  Some load funds allow contributions as small as $50/month.  (Id.)  Despite representing that no-load funds were for speculators, defendants failed to inform customers of the Thrift Savings Plan ("TSP"), a federal government retirement savings plan offering investments in five no-load funds.  (NOL, Exhibit 3, at 4 & n.6.)

First Command further exaggerated the extent to which customers could obtain the benefits

---

[3] The Court provides a representative sample of the misstatements and omissions identified by the SEC and NASD here, but does not endeavor to catalog all such alleged misrepresentations.

[4] Respondent's sanctions included a $12 million fine for restitution and investor education.  (NOL, Exhibit 2 ¶ 29(a), & Exhibit 3, at 18.)

[5] The rate at which customers remained in or exited their SIPs is called the "persistency rate."

1    of "dollar cost averaging"[6] only through a SIP.  No-load and load mutual funds often have

2    effective dollar-cost-averaging features.  (NOL, Exhibit 2 ¶ 19, & Exhibit 3, at 10.)  Furthermore,

3    the mere reliance on dollar cost averaging did not mean SIPs would perform better than more

4    conventional mutual funds.

5         Finally, First Command used misleading sales charts that overstated the cash volatility of

6    investments other than SIPs ("Stable Cash Flow Chart").  (NOL, Exhibit 2 ¶ 22, & Exhibit 3, at

7    11-12.)  Another sales chart misrepresented the average time that an investor remained in a SIP

8    versus other types of investments ("Holding Period Chart").  (NOL, Exhibit 2 ¶ 22, & Exhibit 3, at

9    12-13.)  As the source of data, both charts cited data from the Investment Company Institute

10   ("ICI"), but ICI produced no data on cash volatility and specifically warned against using its

11   information to calculate holding periods.  (NOL, Exhibit 2 ¶ 23, & Exhibit 3, at 11-13.)

12        On September 29, 2006, President Bush signed into law the Military Personnel Financial

13   Services Protection Act, which banned SIP sales.  Pub. L. 109-290, § 4, 120 Stat. 1317, 1318-19

14   (2006) (codified at 15 U.S.C. § 80a-27(j)).  There, Congress found the SIP "largely disappeared

15   from the civilian market in the 1980s, due to excessive sales charges[.]"  Id. § 2(4).  Congress

16   condemned "excessive sales charges [that] allow abusive and misleading sales practices in

17   connection with [SIPs]."  Id. § 2(6).

18   **B.    Procedural History**

19        After filing a complaint and first amended complaint (Doc. Nos. 1, 29), plaintiffs then filed

20   a consolidated amended complaint ("CAC") on July 22, 2005 (Doc. No. 70).  On April 10, 2006,

21   the Court granted in part defendants' motion to dismiss the CAC.  (Doc. No. 108.)  The Court

22   dismissed without prejudice plaintiffs' claim under § 10(b) of the Securities Exchange Act of 1934

23   and Rule 10b-5 because plaintiffs failed to adequately plead scienter.  (Id. at 9.)  The Court

24   dismissed plaintiffs' claim under the Investment Advisers Act ("IAA") for lack of standing.  (Id. at

25   11.)  The Court denied defendants' motion to dismiss plaintiffs' claim under § 12(a)(2) of the

26

27        [6] As defined by the NASD, "[d]ollar cost averaging is the process of investing a fixed amount
     on a periodic basis so that the investor purchases shares at different prices."  (NOL, Exhibit 3, at 10.)

28   Specifically, by investing the same amount each period, the investor purchases more shares when the
     security price is low, and fewer shares when the price is high.

1    Securities Act of 1933.  (Id. at 12.)

2    Plaintiffs filed the CSAC on May 1, 2006. (Doc. No. 110.)   The CSAC abandoned the IAA

3    claim and presented only two claims: a § 10(b)/Rule 10b-5 claim and a § 12(a)(2) claim.  On July

4    27, 2006, after defendants moved to dismiss the CSAC, the Court denied that motion with respect

5    to the § 10(b)/Rule 10b-5 claim but dismissed the § 12(a)(2) claim with prejudice.  (Doc. No. 121.)

6    Therefore, plaintiffs have a lone § 10(b)/Rule 10b-5 claim remaining.

7    On February 27, 2007, the Court set an extended briefing schedule on plaintiffs' motion for

8    class certification. (Doc. No. 144.)  On April 30, 2007, plaintiffs filed the motion.  (Doc. No. 148.)

9    On May 25, 2007, defendants filed their opposition  (Doc. No. 156) and their motions to strike

10   (Doc. No. 157.)  On June 11, 2007, plaintiffs filed their opposition to the motions to strike.  (Doc.

11   No. 166.)  On June 18, 2007, the parties filed their respective replies.  (Doc. Nos. 168-69.)  The

12   Court held oral argument on June 25, 2007 and then took the matter under submission.

13                                                        **DISCUSSION**

14   **A.    Defendants' Motions To Strike**

15          1.    Legal Standard

16          Pursuant to Federal Rule of Civil Procedure 12(f):

17          Upon motion made by a party before responding to a pleading or, if no responsive
            pleading is permitted by these rules, upon motion made by a party within 20 days
18          after the service of the pleading upon the party or upon the court's own initiative at
            any time, the court may order stricken from any pleading any insufficient defense or
19          any redundant, immaterial, impertinent, or scandalous matter.

20   "A motion to strike should not be granted unless the matter to be stricken clearly could have no

21   possible bearing of the subject of the litigation.  If there is any doubt whether the portion to be

22   stricken might bear on an issue in the litigation, the court should deny the motion."  Platte Anchor

23   Bolt, Inc. v. IHI, Inc., 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (internal citations omitted).

24   The court views the pleading in the light most favorable to the nonmoving party.  In re

25   2TheMart.com, Inc. Sec. Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000).

26

27

28

05cv179

1      2.      Bullard Report[7]

2      Defendants filed their motion to strike more than twenty days after plaintiffs served their

3  motion for class certification.  Although defendants' motion is, therefore, technically untimely

4  under Rule 12(f), defendants filed the motion along with their timely opposition to the plaintiffs'

5  motion for class certification.  Furthermore, the Court adopted an extended briefing schedule for

6  this motion.  Therefore, the Court reaches the merits of defendants' motion to strike the Bullard

7  Report.

8      In support of their motion for class certification, plaintiffs submitted the expert report of

9  Mercer Bullard, an assistant professor at the University of Mississippi School of Law.  (Bullard

10  Decla. ¶¶ 2, 4.)  Bullard teaches courses in corporate and securities law.  (Bullard Decla., Exhibit

11  2.)  Prior to entering academia, Bullard was employed at the SEC's Division of Investment

12  Management, where he last held the position of assistant chief counsel.  (Id.)

13      At the class certification stage, courts employ "'a lower Daubert standard'" to analyze the

14  admissibility of expert testimony.  Dukes v. Wal-Mart, Inc., 474 F.3d 1214, 1227 (9th Cir. 2007)

15  (quoting Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209

16  F.R.D. 159, 162 (C.D. Cal. 2002)).  Although this standard is "more lenient," the Court "'must

17  ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter

18  of law.'"  Sepulveda v. Wal-Mart Stores, Inc., 237 F.R.D. 229, 235 (C.D. Cal. 2006) (quoting In re

19  Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 135 (2d Cir. 2001)).  Where an "expert

20  report" amounts to "written advocacy . . . akin to a supplemental brief," a motion to strike is

21  appropriate because this evidence is not useful in evaluating whether class certification

22  requirements have been met.  Fisher v. Ciba Specialty Chems. Corp., 238 F.R.D. 273, 281 (S.D.

23  Ala. 2006).

24      Defendants claim a litany of grounds for striking the Bullard Report.  The most persuasive

25

26      [7] Defendants' motion to strike the Bullard Report has limited import.  First, as plaintiffs

27  conceded at oral argument, the Court can certify the class without the Report, i.e., by relying on the same pleadings, deposition transcripts, and evidence that Bullard cites.  Second, to the extent

28  defendants maintain that Bullard cannot satisfy a Daubert standard, they may renew their motion at a subsequent stage of the litigation.  Foster v. St. Jude Med., Inc., 229 F.R.D. 599, 600 n.1 (D. Minn. 2005).

1   is that Bullard used purely hypothetical assumptions in his calculations of the persistency rate.

2   The report contains a number of speculative calculations about the percentage of accounts that

3   were cancelled (¶¶ 17-19), dormant (¶¶ 21-23), and inactive (¶¶ 25-26.)  Because Bullard lacks

4   any basis for the assumptions underlying his calculations, the Court strikes these eight paragraphs.[8]

5       The Court finds it appropriate to strike other potions of the report.  In paragraph 34,

6   Bullard begins by discussing the misrepresentation that the 50% front-end load keeps out

7   speculators.  However, after the citation to footnote 24, Bullard then asserts that First Command's

8   clients may have themselves engaged in speculation. Bullard cites no evidence for this assertion,

9   and, therefore, the Court strikes paragraph 34 after the citation to footnote 24.

10      Finally, the first sentence of paragraph 66 states that First Command violated laws not at

11  issue in this case.  The Court strikes that irrelevant sentence.

12      While the Bullard Report occasionally rehashes deposition testimony and summarizes

13  various exhibits, the Court declines to parse the report line-by-line to strike every instance in

14  which Bullard merely restates the record.  The Court finds that Bullard reliably applied his

15  expertise as a securities law scholar and a former SEC attorney to create a useful description of the

16  misrepresentations in First Command's script and the training program that emphasized adherence

17  to the script when selling SIPs.  For example, paragraphs 38-39 explain how the 50% load was

18  excessive not only in the amount charged, but also in its subsequent effect on investment

19  performance.  Specifically, Bullard shows the difference in returns from investing in a SIP versus a

20  load fund.  This information is relevant in the determination of whether class members who have

21  not terminated their SIPs suffered economic loss.

22      Also, paragraphs 55-57 discuss a misrepresentation not meaningfully discussed in the SEC

---

[8] The fact that First Command underestimated the number of terminated accounts and did not
account for dormant or inactive accounts <u>does</u> assist the Court in determining whether plaintiffs have
satisfied the requirements of class certification.  The existence of dormant and inactive accounts is
relevant to the issue of whether the class should include plaintiffs who have not yet terminated their
SIPs.  If certain First Command investors have passively stopped investing or reduced the frequency
of their investment, their effective sales load will never fall below the legal maximum.  First
Command's failure to disclose this data about dormant and inactive accounts also counts as another
omission common to the entire class.  The existence of a greater number of common issues makes it
more likely that those issues will predominate over individual ones.  The problem with the Bullard
Report is that, after identifying the existence of such dormant or inactive accounts, Bullard then
speculates about how many accounts are actually dormant or inactive.

and NASD letters: whereas First Command represented to customers that its research and planning staff independently developed a unique financial plan, the staff essentially rubber-stamped the recommendation of First Command's sales advisor.  Every misrepresentation provides another common issue appropriate for class adjudication.

### 3.   January 2000 Letter

The CSAC repeatedly references a letter that NASD mailed in January 2000 warning defendants of alleged false statements in their advertising material.  (Doc. No. 110, at 3, 14, 17, 20,  22, 26, 28, 30, 33, 68, 70, 74, 76, 79, 81, 84, & 86.[9])  The Court relied on this letter when it denied defendants' motion to dismiss the CSAC's Rule 10b-5 claim, finding that the letter enabled the plaintiffs to plead scienter adequately.  Even then, defendants insisted that such a letter did not exist. The Court stated, "if it later becomes clear that plaintiffs did not have a good faith basis for pleading the existence of the NASD letters, the Court will take appropriate action."  (Doc. No. 121, at 7 n.6.)

Plaintiffs now concede the January 2000 letter does not exist.  (Pls. Opp. to Strike, at 11.)  However, plaintiffs point to four letters NASD sent to First Command in 1999.  (NOL, Exhibits 25, 40, & 49-50.)  At least two of these letters (dated April 6 and June 1) address violations of NASD rules in First Command's "Predictable Cash Flow" chart.  (Id., Exhibits 25 & 49.)  Defendants assert these letters are irrelevant because First Command never showed this chart to plaintiffs, but this argument elevates form over substance.  NASD objected to the same kinds of misrepresentations allegedly made in this case (e.g., that no-load funds have high cash volatility and attract speculators).  Therefore, the Court's finding in its Order on the motion to dismiss the CSAC remains sound: taking the plaintiffs' allegations as true, First Command knew about the

---

[9] The following is a representative example of such a reference:

Specifically, the NASD has confirmed that prior to January 2000 the NASD Advertising Regulation Department reviewed the First Command sales script and that, as a result of this review, the NASD in January 2000 sent a letter to First Command's Chief Compliance Officer (Howard Crump) with a copy to Lamar Smith.  This letter summarized the NASD's concerns regarding the enumerated misleading statements and material omissions in the script which were later detailed in the NASD Order.

(Doc. No. 110, at 14.)

1  falsity of its representations prior to the class period.  Furthermore, given the undisputed existence

2  of the 1999 letters, the Court finds plaintiffs had a good-faith basis for referencing NASD

3  correspondence in the CSAC.

4      Plaintiffs plausibly state that the SAC contains a "scrivener's error" when it says, "the

5  NASD in January 2000 sent a letter".  (Pls. Opp. to Strike, at 16.)  Instead, that language should

6  read "the NASD by January 2000 sent a series of letters."  Finding that justice so requires, the

7  Court grants plaintiff's request for leave to amend the CSAC to correct the scrivener's error.[10]  See

8  Fed. R. Civ. P. 15(a).

9      4.    Class Allegations

10     More than a year after plaintiffs filed the CSAC, defendants now move to strike the class

11 allegations with respect to the parent company and the individual defendants.  Seeking to avoid

12 Rule 12(f), defendants claim their motion is responsive to plaintiffs' motion for class certification,

13 which argues that plaintiffs satisfy the Rule 23 requirements only with respect to First Command.

14 (Defs. Memo. ISO Strike, at 14-16.)  Nonetheless, to the extent defendants argue the class cannot

15 establish liability of the parent company and the individual defendants as a matter of law, the

16 Court finds the motion to strike these class allegations untimely.  Furthermore, even if the motion

17 for class certification somehow makes defendants' motion to strike timely, the Court denies the

18 motion to strike on the merits for the reasons stated below.[11]

19     a.    Parent Company

20     Defendants assert, as a matter of law, that the parent company cannot be held liable for the

21 securities fraud of its subsidiary, First Command.  (Defs. Memo. ISO Strike, at 15.)  Defendants

22 further emphasize plaintiffs' failure to allege any grounds for piercing the corporate veil.  (Id.)

23 ──────────────

24 [10] The Court further grants plaintiffs leave to amend the CSAC references to this series of
   letters, if plaintiffs wish to amend the names of the recipients of those letters.  The CSAC claims the

25 letters were mailed to Howard Crump with a copy to Lamar Smith.  However, of the NASD letters
   from 1999 that plaintiffs identify in their opposition, only one was mailed to Crump.  (NOL, Exhibit

26 40.)  Although captioned as a "Letter of Caution," this letter mentions none of the misrepresentations
   at issue in the case.  The letters mentioning the specific misrepresentations at issue here were instead

27 mailed to Gerald Stanley, First Command's Assistant Director of Public Relations.  (NOL, Exhibits
   25 & 49.)

28     [11] Denying the motions to strike is also inappropriate because the class allegations "might bear
   on an issue in the litigation."  Platte Anchor Bolt, Inc., 352 F. Supp. 2d at 1057.

05cv179

1    However, if defendants believe plaintiffs' claims against the parent company cannot prevail  as a

2    matter of law, they should have said so in their motion to dismiss the CSAC.  Instead, defendants'

3    Rule 12(b)(6) motion broadly sought to dismiss plaintiffs' claims with respect to all defendants.

4    Rather than argue the parent company was entirely immune from securities fraud liability,

5    plaintiffs instead argued that the CSAC failed to satisfy certain elements of a 10b-5 cause of action

6    with respect to the corporate defendants.  (Doc. No. 112, at 6-19.)  Federal Rule of Civil Procedure

7    12(h)(2) provides other mechanisms for raising a defense for failure to state a claim outside of the

8    12(b)(6) motion, but a Rule 12(f) motion to strike is not one of them.

9         Furthermore, the Court denies the motion because discovery on this issue is incomplete.

10   Plaintiffs make clear they intend to show the parent company is liable to the class by establishing

11   an agency relationship between it and First Command.  (Pls. Opp. to Strike, at 19-20.)  The CSAC

12   put defendants on notice by identifying the parent company as the "parent corporation" or

13   "corporate parent" of First Command.  (CSAC ¶¶ 4(b)(ii), 32.)  So far, the parties have only

14   exchanged documents relevant to this motion for class certification.  (Nordrehaug Decla. ¶ 3(C).)

15   Documents relevant to the relationship between First Command and the parent company will be

16   exchanged after the Court decides the present motion for class certification.  (Id.)  After the

17   completion of discovery, a motion for summary judgment may be the appropriate mechanism for

18   adjudicating whether the parent company can be found liable, as a matter of law.

19                    *b.    Individual Defendants (Smith and Crump)*

20        Defendants submit three reasons for striking the class allegations as to the Smith and

21   Crump.  First, defendants claim the Court would have granted the motion to dismiss all the

22   CSAC's claims as to Smith and Crump "if plaintiffs had not relied on the non-existent January

23   letter."  (Defs. Memo. ISO Strike, at 15.)  As discussed above, although the correspondence was

24   dated before January 2000, it does exist.[12]

25        Second, defendants rely on Smith's and Crump's deposition testimony that First Command

26

27        [12] Further, in opposition to the motion to strike, plaintiffs submit documentary evidence that
     at least one of the individual defendants (Crump) was internally notified of NASD's April 6, 1999
28   letter concerning misrepresentations in First Command's sales charts.  (Nordrehaug Decla., Exhibit
     4.)

1   representatives did not have to use the track verbatim in SIP sales meetings.  (Id. at 16.)  As

2   explained in the discussion of plaintiffs' class certification motion infra, Ninth Circuit precedent

3   does not require identical oral misrepresentations to all class members.

4          Finally, the individual defendants did not make misrepresentations to any plaintiff because

5   they met with no investors during the class period.  (Id. at 15.)  Plaintiffs do not contest this factual

6   point, but explain that they intend to proceed against Smith and Crump as "controlling persons"

7   pursuant to Securities Exchange Act of 1934, § 20(a) (15 U.S.C. § 78t(a)).  Defendants respond

8   that the CSAC lacks a separate § 20(a) claim.  (Defs. Reply ISO Strike, at 10 n.8.)  The CSAC

9   does, however, describe the individual defendants as "senior controlling officers."  (CSAC, at

10  15:25-26.)  The Court declines to strike the class allegations as to the individual defendants merely

11  because the CSAC lacks a separate cause of action for controlling-person liability.  See Paracor

12  Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161-64 (9th Cir. 1996) (analyzing questions

13  of controlling-person liability for Rule 10b-5 violations where plaintiff did not plead a separate

14  cause of action under § 20(a)).  If defendants believed the CSAC's stand-alone Rule 10b-5 cause

15  of action was insufficient to establish liability against the individual defendants, they could have

16  so argued in the motion to dismiss.  The Federal Rules of Civil Procedure provide other

17  mechanisms for defendants to litigate these issues on the merits later in the litigation.

18      5.   Class Definition

19         Although plaintiffs' class definition originally appeared in the CSAC filed over a year ago,

20  the Court considers defendants' motion to strike on the merits because the motion accompanied

21  defendants' timely opposition to the motion for class certification, wherein plaintiffs changed its

22  definition of the class.  In the CSAC, plaintiffs defined the class as "all persons who, [from

23  January 31, 2000 to December 31, 2004] purchased a SIP from First Command, or one of its

24  predecessors in interest or made a SIP payment or increased their monthly SIP payments, and still

25  owned their SIP as of December 15, 2004."  (CSAC ¶ 81.)  In the motion for class certification,

26  however, plaintiffs defined the class as "all persons who, [from January 31, 2000 to December 31,

27  2004] made a SIP payment so as to be charged a 50% sales charge on the money placed at that

28  time into the SIP through First Command and still owned the SIP on December 15, 2004."  (Pls.

1    Memo. ISO Class Certification, at 1-2.)  At oral argument, plaintiffs' counsel stated that plaintiffs

2    wish to proceed with the class definition proposed in their motion for class certification.

3         In their motion to strike, defendants argue the revised class definition is overly broad

4    because it includes customers who purchased their SIP before the class period and customers who

5    have not terminated their SIPs.  The Court addresses (and rejects) these arguments <u>infra</u> in the

6    analysis of plaintiffs' motion for class certification.  Therefore, the Court denies the motion to

7    strike.  However, because the Court modifies the class definition proposed in plaintiffs' motion for

8    class certification, and because that proposed definition is likewise different from the class defined

9    in the CSAC, the Court grants plaintiffs leave to amend the CSAC to conform the class definition

10   according to this Order.

11   **B.        Plaintiffs' Motion for Class Certification**

12        1.    <u>Legal Standard</u>

13        Under Federal Rule of Civil Procedure 23(a), the prerequisites to a class action are:

14        (1) the class is so numerous that joinder of all members is impracticable, (2) there
          are questions of law or fact common to the class, (3) the claims or defenses of the
15        representative parties are typical of the claims or defenses of the class, and (4) the
          representative parties will fairly and adequately protect the interest of the class.
16
17   In addition to these prerequisites, plaintiffs must show at least one of the Rule 23(b) requirements

18   is satisfied.  Here, plaintiffs claim class certification is appropriate because "the questions of law

19   or fact common to the members of the class predominate over any questions affecting only

20   individual members, and [because] a class action is superior to other available methods for the fair

21   and efficient adjudication of the controversy."  <u>Id.</u> 23(b)(3).[13]

22        In determining whether Rule 23 is satisfied, the Court must accept the truth of the

23   allegations in the plaintiff's complaint.  <u>Blackie v. Barrack</u>, 524 F.2d 891, 901 n.17 (9th Cir.

24   1975); <u>Westways World Travel, Inc. v. AMR Corp.</u>, 218 F.R.D. 223, 230 (C.D. Cal. 2003).  As the

25        [13] Plaintiffs also claim the prosecution of separate actions would "create a risk of . . . (B)

26   adjudications with respect to individual members of the class which would as a practical be dispositive
     of the interests of the other members not parties to the adjudications or substantially impair or impede
27   their ability to protect their interests[.]"  Fed. R. Civ. P. 23(b)(1)(B).  Plaintiffs make a conclusory
     allegation that piecemeal litigation of their claims "would create the risk of inconsistent judgments"
28   (Pls. Memo. ISO Class Certification, at 22).  By asserting that the complexity of the claims and
     relatively small amount of any particular plaintiff's damages would prevent piecemeal litigation,
     however, plaintiffs are really arguing that a class action is the superior method of adjudication.

party seeking to certify a class, plaintiffs bear the burden of demonstrating that they satisfy the elements of Rule 23.  Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977); W. States Wholesale, Inc. v. Synthetic Indus., Inc., 206 F.R.D. 271, 274 (C.D. Cal. 2002).

        2.     Numerosity

Defendants do not rebut plaintiffs' estimate that the class consists of about 100,000 people. (Pls. Memo. ISO Class Certification, at 18.)  This number is sufficient to make joinder impracticable.  See Lowdermilk v. U.S. Bank Nat'l Ass'n, 479 F.3d 994, 997 (9th Cir. 2007) (finding numerosity satisfied where there were potentially thousands of eligible class members). The Court finds this action satisfies the numerosity requirement.

        3.     Commonality

Common questions of law and fact exist where "the complaint alleges a common course of conduct over the entire period, directed against all investors, generally relied upon, and violating common statutory provisions[.]"  Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 914 (9th Cir. 1964) (interpreting an earlier but similarly worded version of Rule 23).  The Ninth Circuit applies a "common course of conduct" test to determine whether to certify a class in a fraud case. Blackie, 524 F.2d at 903-04; In re Badger Mountain Irrigation Dist. Sec. Litig., 143 F.R.D. 693, 698 (W.D. Wash. 1992).  Therefore, class certification is appropriate where investors are "allegedly defrauded over a period of time by similar misrepresentations[.]"  Blackie, 524 F.2d at 902; accord In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 314 (3d Cir. 1998); Negrete v. Allianz Life Ins. Co. of N. Am., 238 F.R.D. 482, 492 (C.D. Cal. 2006). The existence of oral, rather than written, misrepresentations does not preclude class certification. In re First Alliance Mortgage Co., 471 F.3d 977, 991 (9th Cir. 2006) (discussing In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 140 F.R.D. 425, 430 (D. Ariz. 1992)); Badger Mountain, 143 F.R.D. at 698 & n.2 (discussing Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 724 (11th Cir. 1987)).  The commonality requirement is "construed permissively" such that "[a]ll questions of fact and law need not be common to satisfy the rule."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998); Schwarm v. Craighead, 233 F.R.D. 655, 660-61 (E.D. Cal. 2006). Furthermore, "Ninth Circuit decisions favor a liberal use of class actions to enforce federal

1  securities laws." <u>Weinberger v. Thornton</u>, 114 F.R.D. 599, 602 (S.D. Cal. 1986); <u>accord</u> <u>In re</u>

2  <u>Adobe Sys., Inc. Sec. Litig.</u>, 139 F.R.D. 150, 152-53 (N.D. Cal. 1991).

3         The Court finds the commonality requirement is established by plaintiffs' allegations of a

4  "common course of conduct" to defraud investors with similar misrepresentations.  The record

5  (including the SEC cease-and-desist order and the NASD letter) establishes that First Command

6  sold SIPs by using a script that contained misrepresentations about, <u>inter alia</u>, the disciplining

7  effect of the front-end load and the characteristics of investment alternatives.  First Command

8  sales agents testified about the importance of memorizing the sales scripts before meeting with

9  customers.  First Command's objective  was a "homogenized" sales force that could give

10  customers the same responses to the same questions throughout the country.  Although defendants

11  argue that actual sales pitches did not exactly follow the script and, therefore, the oral

12  misrepresentations were never uniform, the Ninth Circuit's case law does not require identical

13  misrepresentations to satisfy the commonality requirement.  <u>First Alliance Mortgage</u>, 471 F.3d at

14  991; <u>Blackie</u>, 524 F.2d at 902.  Furthermore, if the Court focuses just on the misrepresentations of

15  the disciplining effect of the 50% front-end load and the popularity of no-load funds among

16  speculators, all named plaintiffs were exposed to at least one misrepresentation identified by the

17  SEC and NASD.  (Bhowmik Decla. ISO Pls. Reply, ¶ 3(B)&(E).)

18         Plaintiffs also present a common theory of damages.  Economic loss is a required element

19  of a 10b-5 cause of action.  15 U.S.C. § 78u-4(b)(4); <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336,

20  342 (2005); <u>Johnson v. Alijan</u>, — F.3d —, 2007 WL 1760751, at *3 n.13 (9th Cir. June 20, 2007).

21  In plaintiffs' own words:

22         given the lack of justification for the 50% load, the economic loss can easily and
         uniformly be measured as the amount taken as the 50% load during the Class
23         Period.  The subsequent payments are irrelevant to the loss calculation because but
         for the 10b-5 violation, this 50% sales commission would not have been paid at
24         all[.]

25  (Reply ISO Class Certification, at 7.)  Therefore, plaintiffs intend to recover the portion of the

26  50% sales load that each plaintiff paid during the class period.  Plaintiffs' entitlement to these

27  damages is another common legal issue uniting the class.

28

1        4.    <u>Typicality</u>

2        "The commonality and typicality requirements . . . tend to merge" because both focus on

3    the similarities in claims across the class.  <u>Gen. Tel. Co. of Southwest v. Falcon</u>, 457 U.S. 147, 158

4    n.13 (1982).  The typicality requirement means the named plaintiffs' claims are "reasonably co-

5    extensive" with the absent class members' claims, even if the claims are not "substantially

6    identical."  <u>Hanlon</u>, 150 F.3d at 1020; <u>Sepulveda</u>, 237 F.R.D. at 242.  "The test of typicality 'is

7    whether other members have the same or similar injury, whether the action is based on conduct

8    which is not unique to the named plaintiffs, and whether other class members have been injured by

9    the same course of conduct.'"  <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 508 (9th Cir. 1992)

10   (quoting <u>Schwartz v. Harp</u>, 108 F.R.D. 279, 282 (C.D. Cal. 1985)); <u>Schwarm</u>, 233 F.R.D. at 661.

11   The need to calculate individual damages does not defeat typicality.  <u>Blackie</u>, 524 F.2d at 905;

12   <u>Mortimore v. Fed. Deposit Ins. Corp.</u>, 197 F.R.D. 432, 436 (W.D. Wash. 2000).

13       Following the Ninth Circuit's opinion in <u>First Alliance</u>, the Court finds the present class

14   action is based on conduct not unique to the named plaintiffs.  Although no two sales meetings

15   proceeded exactly the same way, First Command's script amounts to what <u>First Alliance</u> variously

16   described as "a standardized sales pitch," "'centrally orchestrated strategy," and "'underlying

17   scheme'" to defraud customers.  471 F.3d at 991 (quoting in part <u>Lincoln Savings</u>, 140 F.R.D. at

18   430-31).  <u>First Alliance</u> further rejected the argument that Rule 23's commonality requirement

19   demanded a showing that the subject misrepresentations were quoted verbatim from the track to

20   each class member.  <u>Id.</u> at 990.  If a defendant could avoid liability for defrauding a class by

21   rewording misrepresentations across the class, "[t]he class action mechanism would be impotent."

22   <u>Id.</u> at 992.  From this premise, the Court logically concludes that the named plaintiffs can likewise

23   be "typical" even if those plaintiffs did not receive all of the same misrepresentations.

24       The same sales pitch, strategy, and scheme that injured the named plaintiffs likewise

25   injured the absent class members.  All class members received a sales presentation taken from the

26   track and then paid a 50% sales load on their first twelve investments–after either purchasing their

27   SIP or increasing their investment in a previously purchased SIP.

28       Although individualized calculations of damages do not defeat typicality, the named

1  plaintiffs are typical only if absent class members have incurred an injury that gives rise to

2  damages.  Here, some absent class members do not "have the same or similar injury" because First

3  Command previously refunded all of the 50% sales charge.  A First Command SIP purchaser who

4  terminated within the first forty-five days received back the entire sales charge.  (NOL, Exhibit 3,

5  at 3 n.3.)  Because these absent class members have already obtained the damages plaintiffs seek

6  in this litigation, the named plaintiffs (who have not obtained a full refund of their sales loads[14])

7  are not typical of this subset of absent class members.  Therefore, the Court excludes from the

8  class those individuals who paid some portion of a 50% sales load during the class period, but then

9  received a full refund of that sales load by terminating within forty-five days.[15]

10        5.      Adequate Representation

11        The Ninth Circuit applies a two-pronged test to determine whether the named plaintiffs can

12  fairly and adequately represent the class.  The first prong is "the named representatives must

13  appear able to prosecute the action vigorously through qualified counsel[.]"  Lerwill v. Inflight

14  Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978); Kavu, Inc. v. Omnipak Corp., — F.R.D.

15  —, 2007 WL 201093, at *5 (W.D. Wash. Jan. 23, 2007).  The second requirement is "the

16  _____

17      [14] Defendants further argue the class should also not include those individuals who terminated
    their plans within eighteen months of purchase.  By statute, such customers are entitled to receive back
18  at least 85% of the total payments made. 15 U.S.C. § 80a-27(d).  Indeed, named plaintiffs Scott and
    Krystin Wagner terminated within the eighteen-month time frame and received back $4100 of the
19  $4700 they invested in a SIP.  (Kelley Decla., Exhibit A, at 18-19.)  At oral argument, plaintiffs'
    counsel could not answer the Court's question why the class should include plaintiffs like the Wagners
20  who received a partial refund of the money invested.

21      Nonetheless, at this stage, the Court finds the class should include First Command customers
    who terminated more than forty-five days but fewer than eighteen months after purchasing their SIP.
22  These customers received back some but not all of the 50% sales load.  For a customer who
    discontinues SIP contributions after eighteen months, the sales load comprises 31.6% of the amount
23  invested.  (Bullard Decla., Exhibit 1 ¶ 9.)  When the investor terminates the SIP within eighteen
    months of purchase, the statute still allows the investment company to keep as much as 15% of the
24  investor's total payments.  Therefore, in the case of the Wagners, First Command retained a portion
    of the 50% sales charge they paid.  Because plaintiffs argue for full reimbursement of the sales charge,
25  the Wagners are still entitled to some recovery under plaintiffs' theory.  Furthermore, the Court finds
    that plaintiffs seeking the return of some fraction of the sales load paid during the class period are
26  typical of plaintiffs still seeking the return of the entire sales load paid during the class period.

27      [15] Plaintiffs impliedly concede the class should exclude customers who received a full refund
    of the sales load.  (See Pls. Memo. ISO Class Certification, at 2.)  However, plaintiffs include no
28  explicit language in their class definition to exclude such customers.  Therefore, the Court will add
    such language to the class definition.

05cv179

1  representatives must not have antagonistic or conflicting interests with the unnamed members of

2  the class." Id.

3       The Court finds plaintiffs satisfy the first prong by submitting the resumes of the five law

4  firms currently representing the class. (Blumenthal Decla., Exhibits 1-5.) Having reviewed those

5  resumes, the Court finds that the named plaintiffs are represented by qualified counsel with

6  extensive experience in class action litigation. Defendants have not opposed the qualifications of

7  plaintiffs' counsel.

8       Some of defendants' arguments concerning the named plaintiffs, while offered under the

9  heading of "typicality," are better addressed under the adequacy of representation prong.[16]

10  Defendants raise two broad challenges to the adequacy of named plaintiffs. First, defendants

11  challenge whether plaintiffs who increased their investment in a SIP purchased before the class

12  period can adequately represent absent class members who purchased a SIP for the first time

13  during the class period. Plaintiffs purchasing before the class period cannot recover for the sales

14  load paid on that original purchase because the five-year statute of repose bars such a suit. 28

15  U.S.C. § 1658(b)(2). By increasing their investment during the class period, however, these class

16  members paid a 50% sales load on the portion of their increased investment. Mr. Robert Kimnach

17  is an example: he purchased his SIP in 1998 and, during the class period, increased his Roth IRA

18  contribution when Congress increased the maximum. (Kelley Decla., Exhibit Z, & Exhibit G, at

19  225.) Defendants argue that Mr. Kimnach cannot represent the class because he was routinely

20  increasing his investment in response to changes in the law.

21       The Court finds no antagonistic or conflicting interests between plaintiffs who increased

22  their SIP investment during the class period and those who purchased a SIP for the first time. First

23  _____

24  [16] As with commonality, the uniformity of First Command's conduct in using the track to sell
SIPs is the basis for the Court's finding that the plaintiffs satisfy typicality. As the Supreme Court

25  explained in Falcon, the commonality and typicality inquiries overlap in their focus on the similarities
in class claims. 457 U.S. at 158. Here, all the plaintiffs' claims are similar (i.e., misrepresentations

26  and omissions in the track defrauded First Command customers into paying a 50% sales load in
conjunction with a SIP). Therefore, when defendants challenge the ability of certain plaintiffs to

27  represent absent class members who are situated slightly differently (e.g., increased an investment on
a previously purchased SIP, continued investing in their SIP after the class period), they are really
making arguments about the adequacy of the named plaintiffs to represent those absent class members.

28  I.e., the argument is whether the differences in class members' situations give rise to "antagonistic or
conflicting interests".

05cv179

Command's misrepresentations—especially the misleading characterizations of investment alternatives that customers might have chosen—could induce investors to increase their SIP investment just as much as they could induce a first-time SIP purchase. This is specifically true in Mr. Kimnach's case. At his deposition, Mr. Kimnach indeed testified that he increased his Roth IRA contribution in response to the Congressional maximum (Kelley Decla., Exhibit G, at 227), but this was not the only reason. When specifically asked whether he increased his Roth IRA contribution only because Congress increased the maximum, Mr. Kimnach responded, "it's also part of . . . not understanding or being told that I didn't have other investment options. . . . I should have and could have put that portion in a no-load IRA. But First Command had convinced me that no loads were for speculators and that wasn't the right thing to do." (NOL, Exhibit 33, at 119:2-9.) To increase his Roth IRA contribution, Mr. Kimnach was directed to a First Command field office. (Kelley Decla., Exhibit G, at 113.) At the field office, Mr. Kimnach had a conversation with a First Command sales representative that was "similar" to his conversation with a different agent in a different city when he initially purchased the SIP. (NOL, Exhibit 33, at 115:11-17.) In fact, the second agent "came back with the exact same responses to [Kimnach's] concerns," including the representation that investment alternatives were for speculators. (Id.) Based on this evidence, the Court finds that Mr. Kimnach does not have "antagonistic or conflicting interests" with absent class members who purchased a SIP during the class period.[17]

Second, defendants challenge whether plaintiffs who have terminated their SIPs can adequately represent absent class members who continue to invest in their SIPs. Defendants claim plaintiffs fail to incur an economic loss if they continue investing in their SIP long enough that the effective sales load eventually declines to a level that is not "excessive" (however one might define "excessive"). At oral argument, plaintiffs' counsel responded that, regardless of the current

---

[17] In allowing Mr. Kimnach to serve as a class representative and including within the class those customers who increased their investment during the class period, the Court expects plaintiffs will limit themselves to alleged wrongdoing that took place during the class period. Plaintiffs do not rebut defendants' contention that claims preceding the class period are barred by the statute of repose. In other words, with respect to members who purchased the SIP before the class period but increased their SIP investment during the class period, the Court expects plaintiffs will only introduce evidence concerning Rule 10b-5 violations associated with the investment increase, and not the original SIP purchase.

1  status of their SIP, investors should recover the 50% load because defendants' fraud was ongoing

2  and because investors could have purchased a no-load fund instead.[18]

3      At this point, the Court finds that plaintiffs have made a sufficient showing of economic

4  loss by class members with open SIP accounts: therefore, the class may include those plaintiffs.  In

5  addition to the excessive sales load paid by plaintiffs who did not continue investing in their SIPs

6  for the full 180 months, the SEC and NASD found that all SIP investors suffered another

7  economic loss, i.e., the lost earnings over time associated with the high front-end sales charges.

8  Because plaintiffs spent 50% of their first twelve investments on a sales charge, only the other half

9  of those investments actually earned a return. Defendants claim this showing is "highly

10  speculative" and, therefore, insufficient to establish economic loss.  The Court reserves for

11  summary judgment the question of whether the lost earnings over time are, as a matter of law, too

12  speculative to satisfy Rule 10b-5's loss requirement.  For the time being, plaintiffs eliminate much

13  of the speculation by arguing for the refund of the 50% sales charge–a damages theory that does

14  not require the Court to figure out how much the plaintiffs would have earned over time if they

15  had invested the same amount of money in a no-load fund, rather than a SIP.  The additional

16  economic loss of incurring an excessive sales charge does not create "antagonistic or conflicting

17  interests" with those plaintiffs who only lost earnings over time (but will remain in the SIP long

18  enough not to pay an excessive sales load).

19      Defendants also specifically challenge the suitability of Kevin and Jennifer Morrison to

20  serve as class representatives.  (Defs. Opp. to Class Certification, at 23.)  Mr. Morrison is currently

21  deployed overseas and never sat for a deposition.  (Id.)  At her deposition, Mrs. Morrison testified

22  she was "pretty distracted" during the meeting with the First Command representative because her

23  attention was focused on their one-year-old son. (Kelley Decla., Exhibit E, at 151-52.)  She never

24  recalled seeing the First Amended Complaint.  (Id. at 187.)  Furthermore, she did not recognize the

25  names of her attorneys or their respective law firms.  (Id., at 182-83.)  Therefore, the Court finds

26  the Morrisons may not serve as class representatives because they "have little or no supervisory

27

28      [18] As plaintiffs' counsel phrased it at oral argument, putting more money into the fraudulent investment does not make the investor even.

role in the litigation and little knowledge of the underlying facts of the law suit." In re

DaimlerChrysler AG Sec. Litig., 216 F.R.D. 291, 299 (D. Del. 2003); accord Butterworth v. Quick

& Reilly, Inc., 171 F.R.D. 319, 322 (M.D. Fla. 1997); Welling v. Alexy, 155 F.R.D. 654, 659

(N.D. Cal. 1994); Rolex Employees Retirement Trust v. Mentor Graphics Corp., 136 F.R.D. 658,

666 (D. Or. 1991).

      6.      Rule 23(b)(3)

Because all four Rule 23(a) requirements are satisfied, the Court turns to Rule 23(b)(3) to

determine whether common questions predominate over individual questions, and whether a class

action is the superior method of adjudicating this controversy.

      *a.*     *Predominance*

Defendants' primary argument in opposition to class certification is that individual issues

of reliance predominate over any common questions of law or fact.[19]  (Defs. Opp. to Class

Certification, at 1.)  A cause of action under Rule 10b-5 requires the plaintiffs' justifiable reliance

on the misrepresentation or omission.  Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999).

Defendants claim that, where there is no presumption of reliance in a Rule 10b-5 case, individual

questions of reliance automatically defeat class certification.  Defendants rely on the following

language from the Supreme Court: "[r]equiring proof of individualized reliance from each member

of the proposed plaintiff class effectively would have prevented respondents from proceeding with

a class action, since individual issues then would have overwhelmed the common ones." Basic v.

Levinson, 485 U.S. 224, 242 (1988) (emphasis added). In Basic, the Supreme Court adopted the

---

[19] Defendants raise novel arguments that class certification would violate the Rules Enabling Act, the Seventh Amendment right to trial by jury, and the due process clause.  (Defs. Opp. to Class Certification, at 11-13.)  Under the Rules Enabling Act, a procedural rule "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).  From this statute, and without any supporting case law, First Command claims the right to present evidence on the specific content of each investor's individual meeting with a First Command representative. First Command also claims that class certification would abridge absent class members' right to trial by jury.  For this proposition, defendants cite out-of-circuit authorities discussing the heightened standards for pleading scienter under the latest amendments to the securities laws, rather than cases pertaining to class certification. Finally, on the basis of some minor dicta in a Fifth Circuit case, First Command alleges a classwide jury verdict would violate the due process clause by taking property without allowing First Command to defend itself properly.  The Court finds all these arguments are meritless, because no federal appellate court has adopted them in the context of class certification in a securities case.

"fraud-on-the-market" theory[20] as a rebuttable presumption in Rule 10b-5 cases.  Because the fraud-on-the-market presumption applies only to cases involving a security's price (not this case), plaintiffs cannot benefit from the presumption.

At oral argument, plaintiffs' primary argument on the reliance issue was to urge the adoption of the Affiliated Ute presumption, which the Supreme Court has described as follows:

> Under the circumstances of [a] case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.

Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972).  According to the Ninth Circuit, the Affiliated Ute presumption "should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions."  Binder, 184 F.3d at 1064.  A case does not primarily allege omissions where "the[] claims are best characterized as either affirmative misrepresentations or 'mixed claims[.]'"  Poulos v. Caesars World, Inc., 379 F.3d 654, 666 (9th Cir. 2004); accord Johnson v. HBO Film Mgmt., Inc., 265 F.3d 178, 192 (3d Cir. 2001); Joseph v. Wiles, 223 F.3d 1155, 1163 (10th Cir. 2000). Defendants describe the present action as "fundamentally a misrepresentation case[.]"  (Defs. Opp. to Class Certification, at 10.)  At oral argument, defendants asserted that any alleged omission in the consolidated SAC is merely the "obverse" of a misrepresented fact.  (See Kelley Decla., Exhibit P.)

The Court declines to apply the Affiliated Ute presumption in this case.  The Bullard report concentrates its analysis on defendant's "misleading sales practices" and includes no separate section on omissions.  (See Bullard Decla., Exhibit 1, at 5.)  At best, plaintiffs' allegations are predominantly "mixed claims," Poulos, 379 F.3d at 666, and the purported omission is simply the "fail[ure] to disclose that the allegedly misleading fact was untrue."  Johnson, 265 F.3d at 193.  If the presumption applied in this case, it would "swallow the reliance requirement almost completely."  Joseph, 223 F.3d at 1163.

---

[20] Briefly summarized, "fraud-on-the-market" theory is the concept that "persons who had traded [a company's] shares had done so in reliance on the integrity of the price set by the market, but because of [defendants'] material misrepresentations that price had been fraudulently depressed." Basic, 485 U.S. at 245.

1   Nonetheless, the Court finds that plaintiffs have satisfied the reliance element, on the basis

2   of the Ninth Circuit's recent opinion in First Alliance and the district court opinion in Lincoln

3   Savings that the Ninth Circuit endorsed.  Defendants claim that the First Alliance court found

4   reliance by applying a presumption under California state law.  (Defs. Opp. to Class Certification,

5   at 5.)  This claim is wrong: the word "presumption" does not appear in the body of the opinion.

6   Instead, the lender in First Alliance argued that reliance was not satisfied because the borrowers

7   signed documents that contradicted the oral misrepresentations.  471 F.3d at 992.  The Ninth

8   Circuit rejected that argument because "it was by design that [plaintiffs] did not understand that

9   the loan documents told a different story."  Id.  California law did not impose a presumption of

10  reliance; instead, it required that the misrepresentation be a "substantial factor" in inducing

11  plaintiffs' action.  Id.

12  Defendants claim First Alliance is distinguishable because that class action arose under

13  state fraud law, but this case arises under Rule 10b-5.  Defendants' attempt to assign talismanic

14  significance to reliance in Rule 10b-5 cases fails in light of First Alliance's extensive discussion of

15  Lincoln Savings, itself a Rule 10b-5 case.  The Lincoln Savings court found that reliance was

16  satisfied because, inter alia[21]:

> a showing that the sales presentations were uniformly patterned on a known model
> provides certitude that material misrepresentations were a causative factor in each
> plaintiffs' decision.  Thus, a class action may be maintained where plaintiffs can
> establish that the sales agents' representations did not vary in material respects.

140 F.R.D. at 430; see Schaefer v. Overland Express Family of Funds, 169 F.R.D. 124, 128-30

(S.D. Cal. 1996) (refusing to allow reliance issues to prevent class certification involving oral

misrepresentations "presented in a fairly similar form," because further discovery would allow

plaintiffs to select the particular theory or presumption of reliance they would rely on).  In effect,

the Lincoln Savings court used the uniformity of the misrepresentations to presume the plaintiffs

relied on those misrepresentations in their investment decisions.  Likewise, here, First Command's

misrepresentations were sufficiently similar to satisfy the commonality and typicality requirements

of Rule 23(a), and to give rise to a presumption that plaintiffs relied on those misrepresentations in

---

[21] The district court also applied presumptions of reliance based on "fraud in the offering" and "fraud in the regulatory process".  Lincoln Savings, 140 F.R.D. at 431, 433.

1    deciding to purchase a SIP or increase their investment in a previously purchased SIP.

2        By acknowledging the reliance requirement and determining that plaintiffs have satisfied

3    that requirement, the Court's findings are faithful to the Supreme Court's holding in <u>Basic</u>.  The

4    Court is not persuaded by defendants' argument that "individual reliance is required in this case."

5    (Defs. Opp. to Class Certification, at 5.)  To the contrary, <u>Basic</u> explained "[t]here is, however,

6    more than one way to demonstrate the causal connection" between an investment company's

7    misrepresentation and an investor's injury, <u>i.e.</u>, reliance.  485 U.S. at 243.  The opinions in <u>First</u>

8    <u>Alliance</u> and <u>Lincoln Savings</u> make clear that, within the Ninth Circuit, plaintiffs can establish a

9    presumption of reliance by means of sufficiently uniform oral misrepresentations in a marketing

10   script.  Nothing in <u>Basic</u> forecloses the creation of a presumption.  Indeed, <u>Basic</u> conceded that, as

11   securities markets evolved into large-scale mechanisms for transactions involving millions of

12   shares, "our understanding of Rule 10b-5's reliance requirement must encompass these

13   differences."  485 U.S. at 244.  Similarly, the reliance requirement must encompass the rise of

14   sophisticated marketing strategies which rely on communicating similar misrepresentations to a

15   large class of investors.[22]  With a presumption of reliance established, common questions of law

16   and fact predominate over individual questions in this action.

17                    *b.    Superior Method of Adjudication*

18       The Court also finds that a class action is the superior method for fair and efficient

19   adjudication of this controversy.  If the approximately 100,000 plaintiffs each pursued their claims

20   individually, they would "clog[] the federal courts with innumerable individual suits litigating the

21   same issues repeatedly."  <u>Dukes</u>, 474 F.3d at 1244.  Although plaintiffs assert complex claims

22   which will be very costly to litigate, each individual plaintiff has a relatively small amount at

23   stake.  Furthermore, the Ninth Circuit has stated a preference for resolving securities claims via

24   class action as a means of deterring fraud.  <u>Harris</u>, 329 F.2d at 913; <u>accord</u> <u>First Alliance</u>, 471 F.3d

25   _____

26       [22] Because the <u>First Alliance</u>/<u>Lincoln Savings</u> presumption is sufficient to establish reliance
     in this case, the Court declines to address whether reliance can be presumed based on fraud in the
27   regulatory process.  Plaintiffs argued for this presumption for the first time in their reply, and
     defendants did not anticipate the argument in their opposition.  Furthermore, at oral argument, the
     Court declined defendants' invitation to argue why that presumption did not apply in this case.  As
28   necessary, the Court will revisit the applicability of the presumption of fraud in the regulatory process
     (<u>e.g.</u>, in a subsequent motion for summary judgment).

1   at 990; <u>Blackie</u>, 524 F.2d at 902; <u>Adobe Sys.</u>, 139 F.R.D. at 152-53; <u>Weinberger</u>, 114 F.R.D. at

2   602.

3                                                    **CONCLUSION**

4           The named plaintiffs are not typical of class members who received a full refund of the

5   entire sales charge.  Because the named plaintiffs otherwise satisfy the requirements of Federal

6   Rule of Civil Procedure 23(a) and (b)(3), the Court **GRANTS IN PART** plaintiffs' motion for

7   class certification.  The Court **CERTIFIES** a class defined as follows:

8           all persons who, during the period from January 31, 2000 through December 31,
        2004, made a SIP payment so as to be charged a 50% sales charge on the money
9       placed at that time into the SIP through First Command and still owned the SIP on
        December 15, 2004, and did not terminate within forty-five (45) days of
10      purchasing the SIP so as to receive a full refund of the sales charge.

11  Mr. Kevin and Mrs. Jennifer Morrison **MAY NOT SERVE** as class representatives because they

12  cannot adequately represent the class.  All other plaintiffs currently named in the Complaint **MAY**

13  **SERVE** as class representatives.

14          Within fourteen (14) calendar days of the date this Order is docketed, plaintiffs **SHALL**

15  **LODGE** a Proposed Order defining the class claims, issues, and defenses, and appointing class

16  counsel.  <u>See</u> Fed. R. Civ. P. 23(c)(1)(B).  Plaintiffs **MAY FILE** simultaneously a brief, not to

17  exceed ten (10) pages, in support of the Proposed Order.

18          Portions of the Bullard Report rely on speculation about the number of dormant or inactive

19  First Command accounts and make conclusions about legal violations not relevant to this case.

20  The remainder of the Bullard Report is useful in the Court's evaluation of whether plaintiffs

21  satisfied the class certification requirements.  Therefore, the Court **GRANTS IN PART** and

22  **DENIES IN PART** defendants' motion to strike the Bullard Report.

23          The Court **DENIES** defendants' motion to strike references to the January 2000 NASD

24  letter in the complaint.  Instead, the Court **GRANTS** plaintiffs' request for leave to amend the

25  complaint to correct the scrivener's error.

26          Defendants' motion to strike the complaint's class allegations as to the parent company and

27  the individual defendants is untimely and inappropriate for resolution in conjunction with a motion

28  for class certification.  The Court **DENIES** this motion, without prejudice to renew the substantive

legal arguments in a motion for summary judgment.

The Court **DENIES** defendants' motion to strike the complaint's class allegations.  The Court sua sponte **GRANTS** plaintiffs leave to amend the complaint to conform the class definition to this Order.

**IT IS SO ORDERED.**

**DATED:  July 30, 2007**

_____
**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

05cv179